Case number 23-7041, United States of America, Israel Mark G. O'Connor and Sarah F. Liebman, and Mark G. O'Connor and Sarah F. Liebman, Appellants, v. U.S. Cellular Corporation, et al. Mr. Wupter for the Appellants, Mr. Akowa for the Appellees. Hello again, Your Honors. I'd like to reserve three minutes here as well, please. In this appeal, the District Court held that disparate FCC and SEC documents that the disclosed substantially the same allegations of fraud alleged in our complaint, and that relators are not an original source of those allegations. That was also error. The complaint only plausibly alleges FCA frauds because these relators are the relators who've been investigating USCC and its affiliates in collaboration with the government for over 15 years. They are not plaintiffs who merely picked up an indictment and pasted allegations in a QTAM complaint with no independent knowledge or work, and without relators' contributions, there would be no plausibly alleged fraud in this case. Thus, like the related appeal, it is absurd to call this a parasitic lawsuit. Defendants would like this Court to believe that these six FCC and SEC documents both misrepresented the true state of affairs and also belied the truth, the X and the Y that in combination allow the observer to infer fraud, Z. But at the same time, defendants have extensively relied on these same documents to argue there was no misrepresented state of affairs. They can't have it both ways, and in so trying have argued themselves out of their own affirmative defense here too. Every one of the FCC and SEC documents publicly touts that William Vale would and did exercise control of Advantage's bidding and after all decision-making over Advantage's build-out and the wireless services offered to consumers in its licensed areas. None of the FCC or SEC filings would lead even the most intrepid first-time reader to infer the frauds that relators allege against Advantage, William Vale, USCC, King Street, and the related defendants. That Vale did not, in fact, control the bidding, the build-out, or the wireless services that would be provided, and that only USCC ultimately provided to consumers in the Advantage licensed areas. And we know this because the intrepid first-time readers at the FCC granted the licenses to Advantage in 2016 because it did not have the benefit of Relator's other fraud allegations based on their independent knowledge, which first became public when Relator's complaint was unsealed in 2019, three years later. Thus, defendants never disclosed that Advantage never intended to control the bidding, hire any staff, maintain real offices, or make any decisions regarding build-out or wireless services, all discoveries that Relator's made and communicated to the DOJ before filing suit. The why is what our own private investigators found, that USCC and King Street controlled the bidding. And thereafter, Advantage had no network, no employees, no business of any kind for its entire unjust enrichment period that would be expected of a wireless telecom company controlling over $450 million in Spectrum licenses. And we can start with the bidding. Defendants never informed the FCC that the bidding would be conducted from King Street's offices or that one of the two authorized bidders, Stephen Hines, was an employee of King Street with no contractual or other relationship with Advantage or William Vale, who was first asked to be a bidder by Allison DiNardo of King Street, not Vale. This is important because Hines had full FCC authority to bid for Advantage, and the power to control is de facto control under the FCC's regulations. Because Hines' role in relationship with King Street wasn't disclosed to the FCC, Relators only learned the full picture by interviewing Hines after the DOJ declined to intervene. And this is just one part of the evidence that Relators gathered that, when considered together, establishes that Advantage had hid from the FCC that headed across the de facto control line before it won licenses at a nearly $113 million discount. Critically, Relators also alleged that defendants had disqualifying arrangements that they purposefully hid from the government, and Relators even provided an example of one, the 2011 lease that we described previously. Especially given Hines' undisclosed status as a King Street employee with full authority to control Advantage's bidding, King Street's own status as a designated entity would have been material to the FCC. In Dish, this court held that a bearer general allegation of undisclosed agreements was sufficient at the pleading stage, aholding the government recently expressly a did-not dispute. In all events, even if this court were to accept the distorted view that publicly available documents contained all the essential elements that lead into an inference of fraud, the Relators are an original source of the allegations. Even under this court's case... I mean, one fact that I think was in the public domain was that Advantage anticipated having only one employee. I don't think that's actually what the disclosures said, Your Honor. It said that there would be one manager of Advantage with a salary of $50,000 a year. It did not say it would be limited to a single manager and that outside of the managerial positions, no other person would ever be employed by Advantage to help with its operation as a telecom company with $450 million worth of licenses. And this goes to the distortions that the defendants make as to all of the public disclosures. They contain empty, innocuous facts. They also say, we did disclose that this bidding was in King Street's offices, for example. But when you look at what they actually said to the FCC, it said that King Street would establish a place where there could be bidding. They did not say that that place would already be established in King Street's offices. And as we cited in our briefing, the FCC finds it, you know, has denied the status where the bidding showed that the bidder would not have unfettered access to a non-designated entity's office space. And nothing in the FCC disclosures that the defendants have pointed to shows that that was what was disclosed to the FCC. Same thing goes for pretty much everything that we allege in terms of, you know, everything that they point to are the misrepresented or misleading state of affairs. Again, the X. It's only what we were able to add with the Y that shows that these half-truths that they presented to the FCC so that they would not raise suspicion, you know. And again, I think the bidding one may be the biggest failure to disclose that we have specifically alleged. Again, they did not tell the FCC that one of the two authorized bidders who had full authority to bid, full control of advantages bidding, was a King Street employee who was asked to do so by Allison DiNardo and who had no contractual relationship with King Street or Allison DiNardo or, I'm sorry, with Advantage or William Vale. I would just say that even under this court's cases interpreting the prior version of the FCA, relators' non-public information materially added to the FCC and FCC filings on which defendants in the district court relied. I think this court's case in Springfield Terminal is instructive. That case, this court held that the relators' very minor additional investigation was enough to make it an original source of publicly disclosed allegations of fraud going to the same defendant for the same fraudulent transactions. In particular, the relator argued that an arbitrator falsely claimed payment for services never rendered to the government and that the relator largely relied on pay vouchers and phone records submitted to publicly disclosed filing. So his actual pay vouchers were disclosed, the X, but there is here the showed the vouchers to be false were not, and this is a stronger case. The pay vouchers, in addition to the fact that FCA has since been amended to make the public disclosure narrower and original source status broader, the pay vouchers in Springfield Terminal were demonstrably false because they included, for example, claims for payment for arbitration services on days the government could easily have discovered, just like the relator there, that the defendant was at a records. The X, the misrepresented state of affairs, was the publicly disclosed vouchers and the phone records as well, and the Y, the trustee of affairs, that the arbitrator was instead at a conference was readily discoverable based on the publicly available documents. Yet the court held there, as it should hold here, that the relators connecting the dots by then actually calling the numbers materially added to the publicly disclosed false and fraudulent transactions. Let me just give you a couple of propositions that my notes say were in the public domain, and let me know if I'm wrong about this. So one is that it was known, and assume there are no channels of communication for this question. Sure. One is that the limited partner, which is King Street, would establish a bidding room and assist in the conduct of bidding activities at the auction. It's helpful to you, it's JA 783. Yes, that is what was publicly available. Okay, shall provide bidding services for the auction. Yes, that was also publicly available. Vale would work with Denardo, that's at 145. That was also publicly available. And Advantage would bid on licenses that overlapped with Cellular's coverage area. Also publicly available. Okay, so why doesn't that give a pretty good sense that Advantage is really working with a non-designated entity having actual control is disqualified. And what those documents do not say to the FCC is that one of the bidders who had full control to bid for Advantage was a King Street employee with no contractual or other relationship with Advantage or Vale that would circumscribe or otherwise delineate what Stephen Hines was allowed to do in the bidding. It did not disclose that. All right, we'll hear from Council for less Cellular and we'll give you some time on rebuttal. Good morning, Mr. Akua. Akua, good morning. My friend on the other side started in what struck me as a very strange place in representing that the fraud that they alleged couldn't possibly have been inferred based on the documents that were placed in the public domain during the FCC wireless auction proceeding. That's strange because that is exactly what the relators claimed from 2015 through the sealed period until the complaint was unsealed and the District Court Judge Chutkan said this complaint is barred by the public disclosure rule. Only at that point did they turn around and say actually we couldn't have inferred it from what was known. And I think that pivot is reflective of what's going on here. You have a public proceeding. Let me put aside the litigation history. I mean I have to say what's in the public domain seems pretty fishy. What they have disclosed at the end of their sleuthing seems quite shocking. And why can't that delta matter? Well, I think it's important to start as these courts, as this court's cases say, from Springfield Terminal forward with what was disclosed. And your honor ended with my friend by identifying just a few of the items that were disclosed by Advantage with respect to its business organization and with respect to its very close interrelation with U.S. Cellular. So here's what was disclosed. We're a brand new entity. We've just been formed. We have zero dollars in general revenue this year. We have zero dollars last year, zero dollars the year before. Not just us, our entire corporate chain. Advantage was nonetheless bidding on hundreds of wireless spectrum licenses and markets from coast to coast. The connections between U.S. Cellular and Advantage are laid out. Here the court looks at JA453. There's one chart that shows the corporate relationship, the control line running through Frequency Advantage, through Sunshine to Mr. Vale on one side, and on the other side, the equity, 90 percent of the equity in U.S. Cellular. So there's no dispute and there's no secret to the FCC that all of this is together. That's fishy. But I mean, you could imagine you could imagine someone like Vale being, you know, having experience in the field, wanting to legitimately stand up a new startup company. And sure, he's going to work with bigger players, but, you know, he's competent enough to control his own part of the operation and they don't cross the control line and they don't lease, they don't cross the 25 percent lease line. But you could imagine that. Well, that's what we say existed. Mr. Vale, paragraph 90 of their amended complaint describes Mr. Vale's experience in the industry. If that's what you say existed, why is the inference of fraud so clear that they don't materially add anything when they show, you know, this guy's a retiree in Florida? What must be there is information sufficient to put the government on the trail. That's the test. Staples, for example, and Oliver are going all the way back. So was the government on the trail? And the whole point of this regulatory proceeding is to put the FCC on the trail. The FCC isn't blind to the concern that the small business subsidy structure it set up could be abused. So it says, give us your information. And also, critically, we'll make it public. So part of the process is not only for the FCC to examine what is known, ask the questions that are asked, there are 40-some interactions between Advantage and the FCC in this circumstance, but also allow the public to do so. And in some applications. So that's the nature of the proceeding. Give us information about the structure, give us information about the business the FCC considers this very question of whether there's impermissible control. So I think that's the trail. Now, in terms of what's shocking, I think there's a misunderstanding that my friends have latched onto about what it is that the FCC expects of designated entities in the situation. There's a 2015 order cited in our brief. And it goes right to this question of, was the FCC expecting designated entities like Advantage, no general revenue, to come on the market and start just delivering wireless services to customers? No employees, no place of business. With or without Judge Kansas. So here's what the FCC says. This is 2015. So this is after the auction. It's while the FCC is considering Advantage's application before the licenses have been awarded. Even large-scale wireless providers backed by well-capitalized corporations have struggled to develop successful business models to compete in today's wireless marketplace. If major corporations cannot enter the market as new providers and deploy facilities-based services to consumers, and this is the kicker, it is wholly unrealistic to expect small businesses to do so. And so what the FCC says is, we understand that if you start from scratch in this market, you're not going to compete with AT&T, which is $100 billion plus of revenue each year. What we expect is that you'll take advantage of ownership of the license, possession of the to work and connect and partner with others. That doesn't require a storefront. That doesn't require employees. It requires trying to figure out what the business opportunities are. It's also, you know, part of the claim here is it makes perfect sense, but it seems hard to reconcile with outer boundaries that carve out de facto control or 25 percent. Not at all. The commission is clear. The designated entity has to control its own business, has to control the licenses, but can and is expected to work with others. And again, expected to work with U.S. Cellular within a context where U.S. Cellular has provided multi-hundred million dollar loan. Mr. Vale has the right, one of the suggestions that's made is it couldn't have been anticipated that Mr. Vale would sell the license rights to U.S. Cellular. That's not right at all. That's on the face of the agreements that are made and that were disclosed to the FCC that Mr. Vale had a right to force U.S. Cellular to buy the licenses. There are also qualified rights of U.S. Cellular to purchase the licenses from Mr. Vale. So this whole notion that they're going to bid together is a bidding protocol too, whereby there's a bidding council that King Street, Ms. Donato herself is a part of, along with a representative of U.S. Cellular and Mr. Vale. They're going to talk together about what bids to make. The bidding protocol also makes clear, it says, here's how we're going to value the licenses. And this is at 853. Here's how we're going to value the licenses. The greater the degree of overlap with U.S. Cellular wireless operating areas, the greater the amount that advantage will be. So all of this is disclosed. All of this is put on the record. The FCC examines it and says, good, good to go. So the question is, was the government on the trail? Yes, the government was on the trail. Government was on the trail from the beginning. It designed the scheme to be on the trail. Let me ask you a conceptual question. If we were to find that the public disclosure bar applied here, which is the best channel for these FCC and SEC filings? Is it number one? Is it an administrative hearing in which the government is a party? Is it an other federal report or hearing? So I think the easiest one for us is channel two, that it's an other federal hearing. An other federal hearing. We have an argument as well that's an other federal report. In Staples, for example, there's a governmental website that's then the information provided by the government is put on a private website, and that's considered to be the news media. So that would be strange, I think, to think that that report, that when the government provides it itself, that's not qualifying. But I think other federal hearing is the easiest. Here you have a designated entity, Advantage Spectrum, that comes to the FCC and says, here's our application. It's considered at length or number of exchanges between the government and Advantage, and then you have the public also weighing in. That seems to be clearly a hearing. And so ruling like that would mean that virtually any federal licensing proceeding would be a federal hearing. And the documents then would be disclosed in that kind of licensing proceeding. It would fit under channel two. I think so, with the caveat that, of course, it would have to be, in order for it to matter, it would have to be publicly disclosed. So there are many kinds of licensing proceedings. The court heard earlier an FDA-related case. I don't think that every new drug application would fit, even if it's a hearing, and I think you could bracket that, because for the most part, the submissions are protected. They're protected commercial information. FDA is generally prohibited, with exceptions, from disclosing those materials. So anything publicly disclosed. Publicly disclosed in a licensing proceeding, where you have this kind of governmental focus on the matter, as well as public rights to view and analyze the materials. And again, that's what relators did. In 2015, they said, well, look at this information that's here. It's been disclosed, and we have a fraud claim that's based on it. And in other settings, such as the Vermont wireless cases that this court is familiar with, parties objected to the grant of licenses based on what was available. So I do think other federal hearings are the easiest. The district court relied on channel one, where the government is a party to the hearing. We think that's plausible, too. One of the issues that underlies this is that below, relators didn't raise any issue as to whether the government was a party. Their sole argument was that it was not a hearing, because there wasn't anything live. It is an interesting, I mean, the FCC is a kind of adjudicator in a licensing proceeding, but the FCC is also the owner of the spectrum. Exactly. What controls the licensing of the spectrum. And so I think it's an interesting conceptual question. Yeah. I think that could be right. We think two is easier. One, is the government a party, where it's the proprietor, it's the sovereign, owns the commons. It's saying how will the commons be used. You can think about environmental permitting and drilling contexts as well. And then the government is the recipient of the revenue from the proceeding. I think it certainly could be the government is a party in this kind of context as well. All right. Any other questions? All right. Thank you. All right. Mr. Woufter, I think you were out of time, but we'll give you two minutes. Thank you, your honors. I'd like to start with this idea of what it is that materially adds to set the government on the trail. And the question is on the trail of what? The FCC in an unchallenged adjudication or unchallenged proceeding like this is not a fraud investigator, and they are not adjudicating something among multiple parties as they did in the FCC case against DISH's designated entities or SHAM designated entities. And I actually think that that case is very important because my friend on the other side has not explained why it is that the FCC would deny the licenses in that proceeding to those entities based on the publicly disclosed filings that they suggest showed that there was a disqualifying relationship, but grant the licenses here based on the FCC filings when there were not these other allegations that we bring based on our own information. I think as Judge Katz, as you were asking, there should be little question that our allegations materially added to the allegations that were in the public domain on that basis alone. I'm sorry, Judge Rehan. Okay. Also, this idea of whether, you know, this public disclosure channel argument is, is interesting conceptually, but this, but because, you know, that we are original sources and these are not substantially the same transactions as alleged in the FCC SCC filings, we don't think this court should wade into any of that at this stage now that the briefing is complete and it's become clear what the real issues are. You know, those are issues of first impression for this court that are, you know, forefront issues nationwide that few courts have Sorry, you want a ruling on materially add? I, we want a ruling that these are not substantially the same allegations as what was disclosed in the FCC and SCC filings. And, but if we lose on that, we want a ruling that at the very least we absolutely materially added. And that is why the government investigated Substantially the same analysis would assume away the channels of communication problem. Absolutely. Because if, because if it is assume all the chance or even assuming that these fall within the three Romanettes one, two, and three, they have to be public disclosures of substantially the same transactions. And if they were public disclosures of substantially the same transactions that show de facto control, the FCC would have denied the licenses here as it denied them in dish At the very least at the pleading stage, we've established that We can take anything from the FCC's decision to license or not license as to whether the FCA has been satisfied here. I'm just not sure that the FCC's actions really speak to any of that because they could decide for any number of reasons to move ahead with the license. Then I suppose that the better way to view it is what did the DOJ do when we uncovered that had, in fact, given its spectrum to USCC and that a King Street employee had full control over advantages bidding. The DOJ investigated those allegations. So the idea that it could set the government on the trail of fraud, it did. And they actually pursued it in this case. And my very, very final point is that, you know, we made it in the briefs and I'll just highlight it here. The other way this court can avoid all these questions is because the defendants themselves argue that the 2008 complaint is the relevant public disclosure that disclosed these frauds. And because, as we explained in the other case, Mark O'Connor is an original source of the allegations in the 2008 complaint, which under the post-2010 FCA, he voluntarily disclosed the government in 2015. He is an original source of the allegations here as well. Thank you, Your Honors. Thank you. Case under advisement.
judges: Wilkins, Katsas, Rao